**Case No. 22-5486/22-5605**

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

◆

**UNITED STATES OF AMERICA,**
*Plaintiff-Appellee,*

**v.**

**PETER BOLOS,**
*Defendant-Appellant.*

◆

On Appeal from the United States District Court
for the Eastern District of Tennessee
The Honorable J. Ronnie Greer
Case No. 2:18-cr-00140-002-JRG-CRW

◆

**BRIEF FOR DEFENDANT-APPELLANT
PETER BOLOS**

◆

R. Sumner Fortenberry
Bradley Arant Boult Cummings LLP
One Jackson Place
188 East Capitol Street, Suite 1000
Jackson, Mississippi 39201
(601) 948-8000
(601) 948-3000 (fax)
sfortenberry@bradley.com

Scott Burnett Smith
Hunter W. Pearce
Bradley Arant Boult Cummings LLP
200 Clinton Avenue West, Suite 900
Huntsville, Alabama 35801
(256) 517-5100
(256) 517-5200 (fax)
ssmith@bradley.com
hpearce@bradley.com

*Counsel for Peter Bolos*

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................. iv

Statement in Support of Oral Argument ................................... 1

Statement of Jurisdiction ......................................................... 2

Statement of the Issues ............................................................ 3

Statement of the Case .............................................................. 6

I.     Statement of Facts ............................................................. 6

II.    Course of Proceedings ................................................... 17

Summary of the Argument ..................................................... 21

Standards of Review .............................................................. 27

Argument ................................................................................ 30

I.     Dr. Bolos's convictions must be vacated. ...................... 30

    A.   None of the indicted acts is a federal crime. ........... 30

    B.   The mail-fraud convictions must be vacated. ......... 43

    C.   The conviction for conspiracy to commit healthcare fraud must be vacated. .............................................. 52

    D.   The misbranding conviction must be vacated. ......... 55

        1.   The misbranding statute is unconstitutionally vague .............. 56

        2.   The Government did not prove misbranding. ........................ 58

II.    The District Court miscalculated Dr. Bolos's sentence. ............ 61

Conclusion .............................................................................. 65

Certificate of Compliance ....................................................... 66

Certificate of Service ............................................................................67

Designation of Relevant Documents in the Electronic Record ............ Addendum-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bond v. United States*,
    572 U.S. 844 (2014)................................................................................31

*Carpenter v. United States*,
    484 U.S. 19 (1987)................................................................................43

*Ciminelli v. United States*,
    No. 22-1170 (S. Ct. cert. granted June 30, 2022) ....................................1, 22, 49

*Cleveland v. United States*,
    531 U.S. 12 (2000)............................................................................*passim*

*Corley v. Rosewood Care Ctr., Inc. of Peoria*,
    388 F.3d 990 (7th Cir. 2004) ..............................................................32, 41, 51

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)................................................................................56

*Harrison v. United States*,
    200 F. 662 (6th Cir. 1912) ................................................................28, 44, 48

*Hedgpeth v. Pulido*,
    555 U.S. 57 (2008)................................................................................42

*Jackson v. Virginia*,
    443 U.S. 307 (1979)............................................................................27, 28

*Johnson v. United States*,
    576 U.S. 591 (2015)........................................................................24, 56, 57

*Kelly v. United States*,
    140 S. Ct. 1565 (2020)............................................................................43

*Landen v. United States*,
    299 F. 75 (6th Cir. 1924) ..................................................................*passim*

# TABLE OF AUTHORITIES
## (cont'd)

Page(s)

*McDonnell v. United States*,
  579 U.S. 550 (2016)............................................................35

*McNally v. United States*,
  483 U.S. 350 (1987)..............................................34, 41, 43

*Neder v. United States*,
  527 U.S. 1 (1999)............................................................42, 52

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
  822 F.3d 650 (2d Cir. 2016) ...........................23, 32, 41, 51

*People v. Powell*,
  63 N.Y. 88 (1875)............................................................53

*Power-Tek Sols. Servs., LLC v. Techlink, Inc.*,
  403 F.3d 353 (6th Cir. 2005) .......................................28

*Rewis v. United States*,
  401 U.S. 808 (1971)..................................................31, 34

*Ruan v. United States*,
  142 S. Ct. 2370 (2022)..............................................39, 40

*Skilling v. United States*,
  561 U.S. 358 (2010)..........................................................42

*State v. Harden*,
  873 So. 2d 352 (Fla. Dist. Ct. App. 2004) .....................36

*United States v. Abbott Lab'ys*,
  505 F.2d 565 (4th Cir. 1974) .....................................59, 61

*United States v. Bobo*,
  344 F.3d 1076 (11th Cir. 2003) .................................52–53

*United States v. Bruchhausen*,
  977 F.2d 464 (9th Cir. 1992) .........................45, 46, 47, 48

*United States v. Bryant*,
  849 F. App'x 565 (6th Cir. 2021) ...................................63

### TABLE OF AUTHORITIES
### (cont'd)

Page(s)

*United States v. Chin,*
15 F.4th 536 (1st Cir. 2021) ....................................................................59

*United States v. Cohen,*
260 F.3d 68 (2d Cir. 2001) .....................................................................54

*United States v. Combs,*
369 F.3d 925 (6th Cir. 2004) ..................................................................27

*United States v. D'Amato,*
39 F.3d 1249 (2d Cir. 1994) ......................................................33, 41, 51

*United States v. Davis,*
139 S. Ct. 2319 (2019) ......................................................................32, 58

*United States v. Dotterweich,*
320 U.S. 277 (1943) ................................................................................59

*United States v. Driver,*
535 F.3d 424 (6th Cir. 2008) ..................................................................28

*United States v. Geborde,*
278 F.3d 926 (9th Cir. 2002) ..................................................................59

*United States v. Hiland,*
909 F.2d 1114 (8th Cir. 1990) ................................................................59

*United States v. Krumrei,*
258 F.3d 535 (6th Cir. 2001) ..................................................................29

*United States v. Kurlemann,*
736 F.3d 439 (6th Cir. 2013) ..................................................................42

*United States v. Lovett,*
764 F. App'x 450 (6th Cir. 2019) ...........................................................63

*United States v. Mahmud,*
541 F. App'x 630 (6th Cir. 2013) ...........................................................63

*United States v. Mallory,*
902 F.3d 584 (6th Cir. 2018) ..................................................................29

## TABLE OF AUTHORITIES
### (cont'd)

Page(s)

*United States v. Mehmood*,
  742 F. App'x 928 (6th Cir. 2018) ........................................................ 62

*United States v. Mitcheltree*,
  940 F.2d 1329 (10th Cir. 1991) .......................................................... 58

*United States v. Novak*,
  443 F.3d 150 (2d Cir. 2006) ........................................................ 46, 48

*United States v. Open Boat*,
  27 F. Cas. 354 (C.C.D. Me. 1829) .................................................... 32

*United States v. Park*,
  421 U.S. 658 (1975) ............................................................................ 59

*United States v. Regent Office Supply Co.*,
  421 F.2d 1174 (2d Cir. 1970) ...................................................... 44, 48

*United States v. Sadler*,
  750 F.3d 585 (6th Cir. 2014) ..................................................... *passim*

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007) ....................................................... *passim*

*United States v. Starr*,
  816 F.2d 94 (2d Cir. 1987) ................................................................ 44

*United States v. Steffen*,
  687 F.3d 1104 (8th Cir. 2012) ..................................... 23, 32, 41, 51

*United States v. Takhalov*,
  827 F.3d 1307 (11th Cir. 2016) ....................................................... 44

*United States v. Trevino*,
  7 F.4th 414 (6th Cir. 2021) ......................................................... 53, 54

*United States v. Triana*,
  468 F.3d 308 (6th Cir. 2006) ...................................................... 29, 63

*United States v. Warshak*,
  631 F.3d 266 (6th Cir. 2010) ............................................................ 64

# TABLE OF AUTHORITIES
## (cont'd)

Page(s)

*United States v. Washington*,
715 F.3d 975 (6th Cir. 2013) ...................................................................64

*United States v. Wiltberger*,
18 U.S. (5 Wheat.) 76 (1820) ..................................................................34

*United States v. Yates*,
16 F.4th 256, 265 (9th Cir. 2021) .............................................................45

*Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*,
579 U.S. 179 (2016)............................................................................48, 52

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982)...................................................................................56

*In re Winship*,
397 U.S. 358 (1970)...................................................................................27

*Wright v. Tenn. Peace Officer Standards & Training Comm'n*,
277 S.W.3d 1 (Tenn. App. 2008).............................................................39

## Statutes

18 U.S.C. § 1084 ..........................................................................................54

18 U.S.C. § 1341 .......................................................................17, 20, 43

18 U.S.C. § 1347 ..........................................................................................54

18 U.S.C. § 1349 ..........................................................................................17

18 U.S.C. § 3231 ............................................................................................2

21 U.S.C. § 331 ......................................................................17, 55, 56, 58

21 U.S.C. § 333 ..............................................................................17, 56, 57

21 U.S.C. § 353 ................................................................................4, 17, 57

28 U.S.C. § 1291 ............................................................................................2

Fla. Stat. § 465.054 ...........................................................................36, 37

TABLE OF AUTHORITIES
(cont'd)

Page(s)

FLA. STAT. § 465.185 ....................................................................36, 37

TENN. STAT. ANN. § 56-7-1002 ........................................................39, 54

**Other Authorities**

42 C.F.R. § 1001.952 .................................................................13, 36, 49

FED. R. CRIM. P. 29 ..........................................................................27

Jon O. Newman, *Beyond "Reasonable Doubt"*, 68 N.Y.U. L. REV.
    979 (1993) ................................................................................29

*Making Birth Control Accessible and Affordable*, FORBES,
    https://www.forbes.com/sites/gabbyshacknai/2020/05/28/how-
    twentyeight-health-founder-amy-fan-is-making-birth-control-
    accessible-and-affordable/?sh=3c9638db6704 (May 28, 2020).........................40

*New HHS Study Shows 63-Fold Increase in Medicare Telehealth
    Utilization During the Pandemic*,
    https://www.hhs.gov/about/news/ 2021/12/03/new-hhs-study-
    shows-63-fold-increase-in-medicare-telehealth-utilization-during-
    pandemic.html (Dec. 3, 2021) ...........................................................40

Robert J. Gregory, *Whose Reasonable Doubt? Reconsidering the
    Appropriate Role of the Reviewing Court in the Criminal Decision
    Making Process*, 24 AM. CRIM. L. REV. 911 (1987)...........................................29

*Telemedicine Startups Roman, Hims, and Keeps Show Enormous
    Growth*, BLOOMBERG SECOND MEASURE,
    https://secondmeasure.com/datapoints/telemedicine-prescription-
    boxes-hims-roman-keeps/ (Dec. 13, 2018).................................................40

TENN. BD. MED. EXAMINERS RULE 0880-02-.14(7)(a)(1) ................................39, 54

U.S.S.G. § 2B1.1................................................................................*passim*

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

This appeal involves felony mail-fraud convictions for acts that do not constitute federal crimes as defined by binding precedent. The defendant managed a telehealth pharmacy that sold real medicines to real patients on real prescriptions written by real doctors who were properly licensed. All the pharmacy transactions at issue were supported by full consideration. There are no property crimes, as this Court and the Supreme Court have narrowly defined federal criminal mail fraud, and thus the convictions are legally flawed. *See United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014); *Cleveland v. United States*, 531 U.S. 12 (2000). To the extent the convictions rest on a lack of accurate information, the Supreme Court will decide the validity of that theory this Term in *Ciminelli v. United States*, which was argued on November 28, 2022. *See* No. 21-1170 (S. Ct. cert. granted June 30, 2022). In addition, there is no evidence beyond a reasonable doubt on the elements of the counts of conviction. The trial transcript and the appendix of trial exhibits are voluminous. Oral argument is warranted given the compelling issues arising from the Government's overcriminalization of telehealth and the vast scope of the record presented.

## STATEMENT OF JURISDICTION

Dr. Bolos appeals from the judgment of conviction entered on June 14, 2022, by the U.S. District Court for the Eastern District of Tennessee. Judgment, R.894. The District Court had jurisdiction under 18 U.S.C. § 3231. Dr. Bolos filed a timely notice of appeal, amended July 8, 2022. Notice, R.888; Amended Notice, R.918. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      It is settled law in this Circuit that, where there is a commercial transaction with full consideration, there is no mail fraud. *United States v. Sadler*, 750 F.3d 585, 590–92 (6th Cir. 2014). Here, Synergy provided real medicines that the Pharmacy Benefit Managers ("PBMs") paid for based on truthful claims data. Did the District Court err by refusing to enter a judgment of acquittal for Dr. Bolos on the mail-fraud counts?

2.      Mere breaches of contract are not mail fraud, even if willful. Here, the evidence showed at most breaches of PBM contracts, not fraud. Did the District Court err by refusing to enter a judgment of acquittal for Dr. Bolos on the mail-fraud counts?

3.      It is the law of this Circuit that, when (1) "the contemplated act is not inherently wrongful"; (2) "the prohibitory statute is ambiguous"; (3) "there is good reason for both lawyers and laymen to think that the act planned is not prohibited"; and (4) the defendant "plans and does the act in the actual belief, supported by good-faith advice of counsel, that it is a lawful act," there is no "corrupt intent" necessary to prove conspiracy to commit a regulatory offense. *Landen v. United States*, 299 F. 75, 78–79 (6th Cir. 1924). Here, the Government charged the *malum*

3

*prohibitum*, regulatory offense of conspiracy to commit healthcare fraud; the applicable statutes and regulations are ambiguous; there is good reason for both lawyers and laymen to think that mere breaches of PBM contracts and State regulatory violations do not constitute healthcare fraud; and Dr. Bolos based his conduct on advice of counsel and believed it was lawful. Did the District Court err by refusing to enter a judgment of acquittal for Dr. Bolos on the count for conspiracy to commit healthcare fraud?

4.      It is well settled that a criminal statute that fails to provide fair notice of the conduct it proscribes is unconstitutionally vague. Here, the Government theorized that Dr. Bolos was guilty of felony misbranding under 21 U.S.C. § 353(b)(1), which "deem[s]" a drug misbranded if not dispensed upon a written prescription of a licensed doctor (but says nothing about the required level of doctor-patient contact), because the prescription was based on insufficient doctor-patient contact. Did the District Court err by refusing to enter a judgment of acquittal for Dr. Bolos on the misbranding count?

5.      Established law holds that felony misbranding requires proof of knowledge and specific intent to defraud, plus proof that the defendant had the power to prevent or correct the misbranding. Here, the Government offered no

proof that Dr. Bolos knew of any misbranding as of February 26, 2016, intended to defraud anyone as of that date, or had the power to prevent or correct the misbranding. Did the District Court err by refusing to enter a judgment of acquittal for Dr. Bolos on the misbranding count?

6. Determining the actual loss amount under U.S.S.G. § 2B1.1 requires proof of fraudulent billings to a healthcare payor; using gross billings as the loss amount without proof that all claims were fraudulent is improper. Here, the District Court used Synergy's gross billings to determine the loss amount, even though there was no evidence of doctor-patient regulations other than those of Tennessee and Florida. Did the District Court err by enhancing Dr. Bolos's Guidelines range based on Synergy's gross billings?

**STATEMENT OF THE CASE**

## I.    Statement of Facts

This is a telemedicine case involving a pharmacy that sold topical pain creams to patients who wanted to avoid opioids and other addictive controlled substances. Synergy Pharmacy Services is a brick-and-mortar business in Florida that defendant Dr. Peter Bolos bought into in 2013. R.775, PageID#11646–47. Synergy had three owners: Andrew Assad, Mike Palso, and Dr. Bolos. R.712, PageID#9871. Dr. Bolos is a radiologist who served as Synergy's managing partner. R.775, PageID#11629–30, 11876. Assad served as Synergy's pharmacist-in-charge. R.775, PageID#11655. Palso has experience in IT and marketing; he served as Synergy's COO. R.775, PageID#11642–43, 11658.

Synergy expanded into sterile compounding and obtained licenses as a telehealth pharmacy in several states, including Tennessee. R.775, PageID#11665–68. In September 2015, Synergy signed a marketing agreement with Scott Roix and his company HealthRight. R.775, PageID#11696; GX-30I, AppPage#39-13803.[1] HealthRight advertised to identify patients interested in pharmaceuticals

---

[1] References to trial exhibits are styled GX-[] for Government exhibits and DX-[] for defense exhibits. Citations to exhibits also feature cross references to the location of the exhibits in the sealed appendix, with the first number denoting the volume of the appendix and the second number the page on which the exhibit begins. Thus, the citation GX-40e, AppPage#41-14001 would describe the

for pain and other ailments. R.775, PageID#11751. The initial contract was priced according to full-time-equivalents, but Synergy and HealthRight split the profits from new patients 50-50. R.708, PageID#9051–52; R.775, PageID#11753–54. Dr. Bolos obtained legal advice on this arrangement and cancelled the contract in May 2016. R.708, PageID#9159–60; R.775, PageID#11757–59. The follow-on contract paid HealthRight a flat fee of $300,000 per week. GX-30J, AppPage#39-13836; *see also* R.709, PageID#9230. This arrangement was later expanded to include additional pharmacies associated with Precision Pharmacy Management (another company owned by Assad, Palso, and Bolos), increasing the weekly rate to $392,307. GX-30K, AppPage#39-13857. Although the Government characterized this arrangement as paying for prescriptions (R.708, PageID#9060, 9067), the evidence is undisputed that Synergy paid HealthRight the same amount each week, regardless of the resulting number of new patients or prescriptions. R.708, PageID#9230–36; R.631, PageID#8049–52; R.711, PageID#9614–15, 9621; R.712, PageID#9743–44, 9761–68; GX-30M, AppPage#40-13866; GX-59H, AppPage#41-14087. Both Synergy and HealthRight used legal counsel to advise on and negotiate these contracts. R.708, PageID#9051, 9136, 9167–68; R.716,

---

government's 40E exhibit, and it could be found on page 14001 in the forty-first volume of the appendix.

PageID#10495; R.780, PageID#12664–76; R.775, PageID#11761–63; DX-22, AppPage#61-134043.

HealthRight conducted its marketing on the internet using social media advertisements. R.708, PageID#8999; GX-30B, AppPage#39-13764. Roix testified that Dr. Bolos had nothing to do with HealthRight's marketing efforts. R.708, PageID#9150–51, 9169–70. Synergy provided HealthRight with prescription pads for standard pain creams, along with recommended substitutes. R.708, PageID#9015, 9018; R.630, PageID#7786, 7807. HealthRight employed telemarketers who made initial contact and nurses who conducted health assessments with potential patients. R.708, PageID#9001–02, 9144. HealthRight also employed licensed doctors who wrote prescriptions for patients who qualified. R.708, PageID#9010. Synergy then submitted the prescriptions to the patients' health insurance, filled the prescriptions, and mailed them to the patients. R.713, PageID#10122–23.

Synergy's customers were all real patients with real pain. Each patient initiated contact by voluntarily filling out an online survey. R.708, PageID#8935; R.779, PageID#12598. HealthRight's telemarketers then followed up by phone. *See id.* If the patient's answers to the intake questions (*e.g.*, care by a physician in

the past year, private insurance, complaints of pain) qualified, they were referred to a nurse or medical assistant who conducted a medical assessment by phone. R.708, PageID#9001–02; R.779, PageID#12390–91. That information was provided to a doctor licensed in each patient's state, who decided whether to write a prescription. R.708, PageID#9172–73; R.712, PageID#9782–90; R.779, PageID#12395–403. The calls were all recorded and confirmed by each patient who testified. R.708, PageID#8973; R.710, PageID#9256, 9311, R.711, PageID#9542–43; R.712, PageID#9806; R.714, PageID#10235; R.716, PageID#10511–12. The recordings show HealthRight accurately explained the telehealth pharmacy process, and each patient approved the prescription and any refills in advance. GX-47D–H, AppPage#41-14025–29; 52C–E, AppPage#41-14055–57; 49E–K, AppPage#41-14038–44; 40D–H, AppPage#40–41-14000–04; 34E–G, AppPage#40-13965–67; 35C–E, AppPage#40-13972–74; DX-11A–C, AppPage#61-134006–08.[2]

The prescribers were all real doctors licensed in each patient's State. GX-31G, AppPage#40-13947; R.708, PageID#9171; R.630, PageID#7919; R.713, PageID#9975. The doctors were independent contractors. R.708, PageID#9010; R.779, PageID#12422. HealthRight paid them the same amount whether they wrote a prescription or not. R.712, PageID#9747–53. The doctors acted

---

[2] The call recordings were not transcribed at trial; the transcript simply reflects "(audio playing)." But the audio files can be played via computer.

9

independently of Synergy. R.712, PageID#9747. The majority of prescriptions were written asynchronously via electronic means; some involved phone calls or electronic consultations with the doctor. R.708, PageID#9046–47; R.712, PageID#9747–55; R.713, PageID#9955–56. Each prescription was filled out for each patient, signed by the doctor, then sent to Synergy, who filled it (as written or for a preauthorized substitute). R.630, PageID#7823–24.

The prescriptions were all for real, clinically effective medicines used to treat headaches, chronic body pain, or nicotine dependence. R.712, PageID#9904–05; R.716, PageID#10404–05; R.779, PageID#12410–16. There were no opioids or controlled substances. R.711, PageID#9488; R.716, PageID#10597–98; R.779, PageID#12405–09. The boxes Synergy mailed to each patient contained real ointments or liquid pain relievers. GX-38F, AppPage#40-13985; GX-52I, AppPage#41-14071. There is no evidence the medicines did not work as intended. R.708, PageID#8921–22. No drugs were mislabeled or adulterated. R.716, PageID#10409. Any refills later mailed were preauthorized. R.630, PageID#7805; R.710, PageID#9325; R.712, PageID#9844; R.714, PageID#10266; R.716, PageID#10532. If a patient called to cancel, Synergy usually cancelled. R.708, PageID#8980; R.630, PageID#7910; R.710, PageID#9300; R.711, PageID#9582–83.

All the prescriptions resulted in real insurance claims. According to trial testimony from the pharmacist-in-charge and two PBMs (CVS Caremark and Express Scripts), pharmacy claims for reimbursement are computer processed. R.713, PageID#9993–95, R.624, PageID#7569-70; R.719, PageID#11060. Once a patient's prescription information is submitted electronically, the PBM processes and approves it via "Computer-Rx" in a split-second. R.624, PageID#7567, 7569–70; R.719, PageID#11060. Synergy had no control over the reimbursement price paid by the PBMs. R.712, PageID#9735; R.716, PageID#10602–04; R.719, PageID#1110–12. There is no evidence that any claim Synergy submitted to the PBMs via Computer-Rx contained any false information. GX-12V–W, AppPage#4-1891–92; GX-2N, AppPage#1-77; GX-11B, AppPage#4-1888; GX-11D, AppPage#4-1889; GX-11F, AppPage#4-1890; GX-2M, AppPage#1-77. The Government conceded that the scheme did not cause any loss to a federal payor (*e.g.*, Medicaid, Medicare, or Tricare). R.956, PageID#16089.

So how did the Government attempt to portray Synergy's business as a fraudulent criminal enterprise? How was Dr. Bolos convicted of numerous federal felonies for running a legitimate pharmacy filling real prescriptions from licensed doctors? Through a series of unindicted acts, violations of State healthcare

regulations, corporate misfeasance, breaches of PBM contracts, and failures to comply with private provider handbooks, which the Government mixed to paint Dr. Bolos's profit and patient-care motive as criminal. But building a profitable, legitimate business to help ailing patients with real pain is not criminal. None of Dr. Bolos's acts is a crime.

The Government didn't charge Dr. Bolos with the substantive crime of healthcare fraud. Nor was he indicted for violating the federal Stark or Anti-Kickback Statutes. Yet the Government's main theme at trial was that Dr. Bolos illegally bought prescriptions from HealthRight. Its opening and closing arguments focused on this unindicted theory of "Prescription Brokering." Indictment, R.278, PageID#4051; Tr., R.707, PageID#8884–98; R.782, PageID#13040–45, 13049–70; GX-60M, AppPage#42-14122. The Government's key witnesses—co-defendants Scott Roix and Andrew Assad, who both pleaded guilty—testified to this pay-for-prescription theory, along with a number of Synergy and HealthRight employees. R.708, PageID#8988–9121; R.709, PageID#9242–44; R.630, PageID#7749–95; R.711, PageID#9591–605; R.712, PageID#9702–08, 9793–94, 9900–06; R.717, PageID#10781–88. But apart from the initial 6-month cancelled contract, the record evidence shows Synergy paid HealthRight a set marketing fee that never changed in relation to the number of patients referred or prescriptions written. GX-

30M, AppPage#40-13866. Such an arrangement falls within the federal safe harbor for "personal services and management contracts," 42 C.F.R. § 1001.952(d). The CVS witness also testified that flat-fee marketing is permitted. R.719, PageID#11107.

The rest of the Government's proof at trial turned on other, noncriminal acts. First, the Government alleged Dr. Bolos defrauded the Tennessee Board of Pharmacy in obtaining its license. Indictment, R.278, Page ID#4068–69. Dr. Bolos's cousin was a pharmacist licensed in Tennessee. Tr., R.775, PageID#11689–90. On Synergy's license application, the cousin falsely stated he was the pharmacist-in-charge, working at least 20 hours per week. GX-16T, AppPage#36-13469. Dr. Bolos signed the Tennessee application but testified that he did not know about the 20-hour-per-week requirement. *Id.*; R.775, PageID#11699. The Government's lone witness on this allegation, a Tennessee regulator, conceded Synergy's license was valid and testified she did not know of any pharmacist who'd had their license revoked for violating the 20-hour rule. R.711, PageID#9386–87. The allegation is also inconsistent with Supreme Court authority, which holds that false statements on a State license application cannot constitute federal mail fraud. *Cleveland v. United States*, 531 U.S. 12, 15 (2000).

13

Second, the Government alleged Dr. Bolos filled prescriptions without a valid doctor-patient relationship. Indictment, R.278, PageID#4061–64. Because the doctors and patients did not conduct an in-person physical exam, this brought into play pre-Pandemic industry guidance on synchronous-vs.-asynchronous telemedicine. The Government did not call an expert on this subject. Instead, its proof turned on soft standards drawn from PBM manuals, Blue Cross Blue Shield guidance, AMA publications, and the like. R.717, PageID#10763–67; R.719, PageID#11082–87; R.779, PageID#12572–85. Also, the District Court (at the Government's urging) took judicial notice of Tennessee and Florida statutes and regulations governing the doctor-patient relationship in the telemedicine context. GX-1C, AppPage#1-59; R.712, PageID#9859; GX-1F, AppPage#1-60; R.779, PageID#12578–79; R.717, PageID#10804–06. But the Court itself instructed the jury that they could not convict Dr. Bolos for violating State regulatory law. R.712, PageID#9859; R.782, PageID#13262–63. And there is no evidence Dr. Bolos wrote any prescriptions here. All the State guidance and regulations govern a relationship the doctor, not the pharmacist, is responsible for. R.716, PageID#10386; R.717, PageID#10798; R.776, PageID#12059–60; GX-104I, AppPage#58-133805.

14

Third, the Government implicated Dr. Bolos in falsifying information in response to PBM audits concerning collection of copays. Indictment, R.278, PageID#4066–68. Synergy did not collect copays up front, instead filling the prescriptions and then invoicing the patient for the copay after delivery. R.630, PageID#7869–70; R.713, PageID#10028–29. The evidence shows Synergy tried but largely failed to collect the copays associated with filled prescriptions. R.630, PageID#7863–64. Instead, Synergy helped patients fund copays through companies who paid patients for medical surveys or via coupons Synergy paid for. R.630, PageID#7890, 7895–96; R.713, PageID#10047–49, 10071–72; R.641, PageID#8142–46. When PBMs audited Synergy's claims, Synergy concealed its relationship with HealthRight and its copay practices. R.631, PageID#8013–14, 8025–28; R.714, PageID#10158–71, 10226–28. A Synergy employee also faked computer records and credit card receipts to make it look like audited patients had paid copays. R.714, PageID#10180–89; R.718, PageID#10823–24, 10837, 10902–14.

Express Scripts, CVS, and others ultimately cancelled their contracts with Synergy. GX-4Q, AppPage#2A-2P-94; GX-5I, AppPage#3-1564; GX-6D, AppPage#3-1801; GX-8B, AppPage#3-1802; GX-8O, AppPage#4-1879; GX-9A, AppPage#4-1886; GX-10B, AppPage#4-1887; *see also* R.719, PageID#11080.

Prescriptions received thereafter were billed by other pharmacies associated with Precision. R.631, PageID#7965, 7981; R.711, PageID#9477–78; R.714, PageID#10285–87. Dr. Bolos testified that he knew nothing about the faked credit card receipts or other falsified records. R.775, PageID#11659–60, 11833–34; R.776, PageID#12047. Synergy's revenue dropped precipitously after its PBM contracts were terminated. R.631, PageID#8035; GX-62C, AppPage#43-14246. Representatives from Express Scripts and CVS testified that retrospective contract-compliance audits found Synergy failed to comply with their private provider manuals, which run to the hundreds of pages and are incorporated into their contracts through boilerplate. R.713, PageID#10065–69; R.624, PageID#7567, 7584, 7588, 7601–10, 7653; R.719, PageID#11061, 11071–73, 11077–81; GX-5A, AppPage#3-1564; GX-5I, AppPage#3-1798; GX-4Q, AppPage#3-1563.

The Government was left to argue that its case against Dr. Bolos depended on the jury finding some violation of State regulatory rules, industry standards, private provider handbooks, and PBM contracts. R.782, PageID#13053, 13063–74, 13082–86, 13089–90, 13095–98. The trial record contains no evidence that Dr. Bolos violated any federal statute. He certainly had no criminal motive. The only motives he had were profit and patient care. R.775, PageID#11737, 11858; R.782, PageID#13044; R.775, PageID#11858, 11892. When he had questions about

business practices, he consulted his counsel. R.775, PageID#11723–30, 11757–59, 11780–83, 11813–15, 11820–22; R.776, PageID#12052–54.

## II.    Course of Proceedings

The Government's indictment covers a complex relationship of corporations and their owners, all of whom pleaded guilty or were dismissed except Dr. Bolos. The first count against Dr. Bolos is conspiracy to commit healthcare fraud, 18 U.S.C. § 1349. Indictment, R.278, PageID#4050–75. Next are 22 counts of mail fraud tied to 22 Tennessee patients, 18 U.S.C. § 1341. PageID#4075–78. Last is one count of felony misbranding tied to interstate shipment of Lidocaine ointment to one Tennessee patient "without a valid prescription," 21 U.S.C. §§ 331(a), 353(b)(1), 333(a)(2). Page ID#4078–79.

The alleged victims were the PBMs, not the patients. Indictment, R.278, PageID#4051; R.894, PageID#14751 (ordering restitution to PBMs). The allegedly criminal means and methods rest not on violations of federal law, but on breaches of PBM contracts, provider manuals, State regulations, and the like. According to the indictment, what's bad about Synergy's pain ointments is they were "profitable" and billed "contrary to one of more provider agreements." R.278, PageID#4053–54. The lack of a valid doctor-patient relationship violated State

regulatory law and "the provider agreements." *Id.*, PageID#4048–50, 4062. Using other pharmacies to fill prescriptions after the PBMs audited and canceled Synergy violated provisions of PBM manuals on "changes in ownership." *Id.*, PageID#4046, 4064. Likewise, the PBM contracts and "Section 2.3 of the Express Script provider manual" required Synergy to collect copays. *Id.*, PageID#4047, 4066. And the Tennessee Board of Pharmacy required, as a regulatory precondition, that a Tennessee-licensed pharmacist be in charge and present "at least 20 hours per week." *Id.*, PageID#4068.

Also notable are the crimes not charged. First, the indictment does not charge the substantive crime of healthcare fraud, just a conspiracy to commit it. *Id.*, PageID#4050–74. Although it alleges facts about "Prescription Brokering," it does not charge any violation of federal Stark or Anti-Kickback Statutes. *Id.*, Page ID#4051–52. While it accuses Dr. Bolos of "launder[ing] money" to assist patients in paying copays, it does not charge any federal money laundering crimes. *Id.*, PageID#4067–68.

Dr. Bolos moved to dismiss the indictment. R.127, PageID#1299 (adopting R.126, PageID#1260). He argued the indictment alleged at best civil breaches of

18

contract or State regulatory violations, not federal crimes. *Id.* The District Court denied the motion. Op., R.175, PageID#1657, 1673.

The trial of Dr. Bolos lasted four weeks. Although the mail fraud counts concern 22 patients and their relationship with their prescribing doctor, the Government called only 7 patients. R.708, PageID#8930; R.710, PageID#9249; *id.*, PageID#9305; R. 711, PageID#9535; R.712, PageID#9803; R.714, PageID#10230; R.716, PageID#10508. The rest of the Government's case was testimony from turned co-defendants Roix and Assad (R.708, PageID#8981; R.712, PageID#9845); a Tennessee Board of Pharmacy regulator (R.710, PageID#9337); Synergy and HealthRight employees (R.630, PageID#7746–47; R.711, PageID#9391–92; *id.*, PageID#9413–14; *id.* PageID#9590–91; *id.*, PageID#9623–24; R.718, PageID#10817–18); PBM representatives from Express Scripts and CVS Caremark (R.624, PageID#7564–65; R.719, PageID#11052–53); a witness on the credit card receipts (R.718, PageID#11002); and a witness from the copay survey company (R.641, PageID#8133–35). The Government did not call an expert on pharmacies or the doctor-patient relationship, nor did it call any of the prescribing doctors licensed in Tennessee.

Dr. Bolos testified in his defense. R.775, PageID#11617. He called one of the Tennessee-licensed doctors. R.779, PageID#12355. He also called Synergy's certified healthcare attorney. R.780, PageID#12631–32.

Dr. Bolos filed motions for acquittal at the close of the Government's case and at the close of all the evidence. R.783, PageID#13290; R.628; R.781, PageID#12907; R.655. The District Court initially reserved ruling on the mail fraud and misbranding counts but ultimately denied the motions at the end of trial. R.783, PageID#13419–29; R.781, PageID#12942–49. The jury convicted on all counts. Verdict, R.663, PageID#8316. Post-trial, Dr. Bolos renewed his motion for acquittal and moved for a new trial. Mot., R.668, PageID#8349; R.669, PageID#8354; Mot., R.702, PageID#8553. The District Court denied those motions. Op., R.768, PageID#11551. The court sentenced him to 168 months imprisonment. J., R.894, PageID#14747. At sentencing, the Government conceded that the scheme did not cause any loss to a federal payor (*e.g.*, Medicaid, Medicare, or Tricare). R.956, PageID#16089. Dr. Bolos is now incarcerated.

## SUMMARY OF THE ARGUMENT

This is an "accurate information" mail-fraud case. The Government convicted Dr. Bolos of a conspiracy to defraud PBMs for deceit about Synergy's marketing arrangement with HealthRight, Synergy's Tennessee pharmacy license, its copay collections, Precision's true ownership, and the doctor-patient relationship. Synergy's claims made no representations about this information, however. Synergy submitted truthful data to the PBMs and its claims were approved instantly. All of Synergy's claims involved real patients who had real prescriptions written by real, licensed doctors for real medicine. So the commercial transactions at issue involve full consideration on both sides. The PBMs' computer claims form asked for none of the information said to be false, so it was not material. Synergy supplied the medicines, and the PBMs paid the claims at the rates set by the patients' health plans.

None of the alleged conduct is criminal. The judgment should thus be reversed and a judgment of acquittal rendered to Dr. Bolos. This Circuit has rejected the theory of mail fraud based on "the ethereal right to accurate information." *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) (Sutton, J.). *Sadler* undermines the entire theory of Dr. Bolos's prosecution, warranting acquittal. The United States Supreme Court is currently considering whether to

make *Sadler* the national rule. *See Ciminelli v. United States*, *cert. granted*, No. 22-1170 (S. Ct. June 30, 2022). The Government has conceded error in *Ciminelli*, admitting in its merits brief that the "accurate information" theory applied by the Second Circuit "is incorrect." Br. for United States at 24. Argument was held in *Ciminelli* on November 28, 2022, and the case will be decided by June 2022.

Each count of conviction is also flawed on other grounds. There is no evidence of criminal conduct sufficient to sustain Dr. Bolos's conviction on any count beyond a reasonable doubt.

The 22 mail-fraud convictions must be vacated because they do not involve property crimes. This Court and the Supreme Court have narrowly defined felonious conduct under the mail and wire fraud statutes to cover only deceit that targets "money or property." *See Sadler*, 750 F.3d at 590; *Cleveland*, 531 U.S. at 18–19. Thus, this Court has held that, where there is a commercial transaction with full consideration on both sides, the victim has not lost "money or property." *See Sadler*, 750 F.3d at 590–92.

The evidence at trial fell far short of proving any property crimes. None of Synergy's claims data contained any false information. The Government offered

five theories of fraud to convict Dr. Bolos: prescription brokering, pharmacy licensing fraud, deceit about pharmacy ownership, copay collection, and the doctor-patient relationship. These theories amount to no more than breaches of contract and State regulatory violations, not federal mail fraud. Mere breaches of contract cannot support a fraud claim. *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016); *United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012).

The conviction for conspiracy to commit healthcare fraud must also be vacated. The underlying offense of healthcare fraud requires proof of materiality. None of the deceit in this case was material. As explained, the PBMs received full consideration for the bargain when the patients received the drugs as billed. All of Synergy's claims data, which is the only information material to payment, was truthful.

Moreover, Dr. Bolos did not have the intent necessary to conspire to commit healthcare fraud. Conspiracy to commit a *malum prohibitum*, regulatory offense requires proof of a "corrupt intent," or "the conscious and intentional purpose to break the law." *Landen v. United States*, 299 F. 75, 78 (6th Cir. 1924). Under *Landen*, Dr. Bolos lacked corrupt intent because (1) healthcare fraud is a

regulatory offense; (2) the healthcare fraud statute is ambiguous in the context of this case, where the alleged fraud is based on lengthy PBM manuals and complex State healthcare statutes and regulations; (3) there is good reason to believe Dr. Bolos's conduct is not actionable under the healthcare fraud statute because of the inconsistency between the Tennessee statute and regulations governing the doctor-patient relationship and the federal-law preemption of the Florida anti-kickback statutes; and (4) Dr. Bolos sought and received legal advice on Synergy's business practices, including the HealthRight arrangement. Dr. Bolos's conviction for conspiracy to commit healthcare fraud must be vacated for lack of the required *mens rea*.

Dr. Bolos's conviction for felony misbranding should be vacated. Dr. Bolos was convicted of felony misbranding because a Lidocaine prescription filled by Synergy on February 26, 2016, was allegedly based on an invalid doctor-patient relationship. This conviction fails as a matter of law and fact. First, the felony misbranding statute is unconstitutionally vague as applied here. Statutes that fail to provide fair notice to citizens of what they proscribe are void for vagueness. *See Johnson v. United States*, 576 U.S. 591, 595 (2015). The misbranding statute simply says that drugs may only be dispensed upon a written prescription of a licensed practitioner. The statute does not provide any notice to a pharmacist that a

regulatory problem with the underlying doctor-patient relationship could expose them to a federal felony. Such a vague statute cannot be the basis of a conviction.

Second, the Government failed to prove misbranding. To prove felony misbranding, the Government must prove that Dr. Bolos had a specific intent to defraud. The Government must further prove that Dr. Bolos had the power to prevent or correct the misbranding. The Government did not carry its burden here. There is no evidence that Dr. Bolos knew about doctor-patient problems as of February 26, 2016, the date of the alleged misbranding. The evidence was that he did not become aware of problems with doctor-patient contacts until April 2016. Moreover, Dr. Bolos testified that he had no access to or control over the HealthRight portal that facilitated communication between the doctors and patients. And he acted immediately when he learned of this issue in April 2016 by addressing it with HealthRight. Thus, the Government failed to prove that Dr. Bolos knew about the February 26, 2016, misbranding, or had the ability to correct or prevent it.

The District Court also miscalculated Dr. Bolos's sentence. As an initial matter, should any of Dr. Bolos's convictions be vacated on the merits, this case must be remanded for resentencing. Even if the convictions remain, however, Dr.

Bolos's sentence was improperly calculated. The District Court improperly aggregated all pharmaceutical claims to determine the loss amount under U.S.S.G. § 2B1.1(b)(1). The District Court improperly assumed that all billings were fraudulent, even though there was no proof of any regulatory violations outside of Tennessee and Florida, the only States whose doctor-patient regulations were offered at trial.

The District Court further erred in shifting the burden to Dr. Bolos to prove the legitimacy of the claims. The rule shifting the burden to the defendant to prove that some claims were legitimate when the fraud is "pervasive" does not govern here. That rule is based on a commentary note from the Guidelines that deals with billings to federal payors (which the Government conceded were not defrauded here) and an "intended loss" calculation (which was not used here). It was thus reversible error for the District Court to calculate the loss amount based on the gross billings without proof of regulatory violations outside of Tennessee and Florida.

### STANDARDS OF REVIEW

This Court reviews the sufficiency of an indictment *de novo*. *United States v. Combs*, 369 F.3d 925, 934 (6th Cir. 2004).

That a defendant will not be convicted upon any less than proof beyond reasonable doubt is a fundamental principle of United States criminal and constitutional law. Indeed, "proof beyond a reasonable doubt has traditionally been regarded as the decisive difference between criminal culpability and civil liability." *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). The principle that proof beyond a reasonable doubt is required to deprive someone of liberty is "basic in our law and rightly one of the boasts of a free society" and "a safeguard of due process of law in the historic, procedural content of 'due process.'" *In re Winship*, 397 U.S. 358, 362 (1970).

Under Federal Rule of Criminal Procedure 29(a), a defendant may move for judgment of acquittal or new trial at the close of the Government's evidence or at the close of all the evidence to challenge the sufficiency of the evidence against him. He may renew such a motion following a guilty verdict. FED. R. CRIM. P. 29(c)(1). Practice under this rule is informed by Civil Rule 50. *See id.* advisory committee note to 1944 adoption.

Dr. Bolos's argument that there was insufficient evidence to support his conviction beyond a reasonable doubt is reviewed *de novo*. *United States v. Driver*, 535 F.3d 424, 428 (6th Cir. 2008). This Court's "critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318.

In a civil case, the court must find "that there is substantial evidence from which the jury could find in favor of the party against whom the motion is made. Only when it is clear that reasonable people could come to but one conclusion from the evidence should a court grant the motion." *Power-Tek Sols. Servs., LLC v. Techlink, Inc.*, 403 F.3d 353, 358–59 (6th Cir. 2005) (cleaned up). In a criminal case, "[w]here all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction." *Harrison v. United States*, 200 F. 662, 664 (6th Cir. 1912) (quoting *Union Pac. Coal Co. v. United States*, 173 F. 737, 740 (8th Cir. 1909)). If the reviewing court has any doubt based on its review of the evidence in a criminal case, it must reverse. Such review is necessary to preserve the presumption of innocence and the criminal standard of proof beyond a reasonable doubt. *See generally* Jon O.

Newman, *Beyond "Reasonable Doubt"*, 68 N.Y.U. L. REV. 979 (1993); Robert J. Gregory, *Whose Reasonable Doubt? Reconsidering the Appropriate Role of the Reviewing Court in the Criminal Decision Making Process*, 24 AM. CRIM. L. REV. 911 (1987).

"Rule 33 permits a new trial if a verdict is against the 'manifest weight' of the evidence." *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018) (quotation omitted). Under Rule 33, the trial judge "take[s] on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice." *Id.*

This Court reviews challenges to the constitutionality of a statute, including vagueness challenges, *de novo*. *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001).

This Court reviews a district court's fact findings at sentencing concerning the loss amount for clear error. *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). The district court's methodology for calculating loss, including the application of a particular Guidelines provision, is a purely legal question and reviewed *de novo*. *Id.*

**ARGUMENT**

**I.      Dr. Bolos's convictions must be vacated.**

**A.      None of the indicted acts is a federal crime.**

Dr. Bolos's convictions must be vacated because none of the indicted acts is criminal. In this case, the Government attempts to turn breaches of contract and State regulatory violations into federal felonies. All counts in the indictment rest on breaches of the PBM agreements and provider manuals and violations of Florida and Tennessee healthcare laws. *See generally* R.278. For example, the indictment quotes extensively from Express Scripts's provider manual, which states that "[f]ailure to collect the Member Copayment is also a material breach of [the pharmacy's] obligations and may result in immediate termination." R.278, PageID#4047. The indictment further quotes the provider manual's requirement that the pharmacies "shall, and cause [their] personnel to, be bound by and comply with . . . all applicable rules and regulations." R.278, PageID#4048. To argue that the pharmacies breached this provision, the indictment quotes several Florida healthcare statutes, including prohibitions on kickbacks for patients referred to a pharmacy and dispensing drugs without a valid doctor-patient relationship. R.278, PageID#4049. The indictment also cites State regulations requiring a licensed Tennessee pharmacist to "be in actual attendance at [SYNERGY] at least 20 hours of each business week" to argue that Synergy's pharmacy license was fraudulent.

30

R.278, PageID#4070. All of the federal crimes indicted here are based on these breaches of contract and State regulatory violations.

This prosecution is a "a sweeping expansion of federal criminal jurisdiction" into "conduct traditionally regulated by state and local authorities." *Cleveland v. United States*, 531 U.S. 12, 24 (2000). Transforming deception arising from State regulatory violations into federal crimes "would occupy a field of criminal jurisdiction long covered by the States." *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014). *See also Bond v. United States*, 572 U.S. 844, 863 (2014) (reading federal criminal statute in light of the "the background principle that Congress does not normally intrude upon the police power of the States"). It would also "transform relatively minor state offenses into federal felonies." *Rewis v. United States*, 401 U.S. 808, 812 (1971). Thus, "'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." *Cleveland*, 531 U.S. at 25 (quoting *Jones v. United States*, 529 U.S. 848, 858 (2000)).

This case also upsets the separation of powers between courts and Congress. "Respect for due process and the separation of powers suggests a court may not, in order to save Congress the trouble of having to write a new law, construe a

criminal statute to penalize conduct it does not clearly proscribe." *United States v. Davis*, 139 S. Ct. 2319, 2333 (2019). "Even where cases lie within the same mischief, if they are not provided for in the text of the act, courts of justice do not adventure on the usurpation of legislative authority to meet them." *United States v. Open Boat*, 27 F. Cas. 354, 357 (No. 15,968) (C.C.D. Me. 1829) (Story, J.). This Court should not read federal criminal statutes to police conduct amounting to no more than breaches of contract and State regulatory violations in the absence of a clear expression from Congress. Otherwise, it would impose private provider and State medical ethics rules on pharmacists nationwide via the mail fraud statute.

This prosecution also threatens the separation of federal criminal law from State contract law. A breach of contract is not mail fraud, even if willful. *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016) (construing the federal mail and wire fraud statutes); *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1007 (7th Cir. 2004) (holding that mail fraud requires proof that, at the time the defendant made the misrepresentation, he "had no intention of honoring it"); *United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012) (holding that, for a nondisclosure "to be actionable fraud (either criminal or civil) the duty to disclose must be independent of any duty imposed by

32

the contract"); *United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994)

("A breach of contract does not amount to mail fraud.").

Corporate compliance with PBM contracts is audited in arrears. R.624, PageID#7567, 7587–88. The claims process includes what limited data (patient name, physician information, and drug dispensing information) is material to the health insurance plans—the ultimate payors. *See* GX-11B, AppPage#4-1888; 11D, AppPage#4-1889; 11-F, AppPage#4-1890; 12-V, AppPage#4-1891; 12-W, AppPage#4-1892. Here, none of the claims data was false. *See* Statement of Facts, *supra* at 10–11. Whether a prescription is issued after an in-person visit, over the phone, or via the internet is immaterial to the PBMs. Under ERISA, PBMs have an obligation to act in the best interests of plan participants, so they are incentivized to timely process drug claims. The PBMs only audit for contractual compliance retroactively. R.624, PageID#7565–67, 7569–70; R.719, PageID#11060, 11071–73, 11097–98. The audits only police contractual compliance, not criminal conduct. The Express Scripts witness admitted that Express Scripts knew nothing about whether Synergy violated any laws; all it knew about were breaches of contract and manual violations. R.624, PageID#7696; R.625, PageID#7720. The Government cannot make any allegations of wrongdoing outside the four corners of the PBM contracts and their provisions concerning compliance with State law.

The Government's breach of contract allegations are not appropriate for criminal prosecution.

The rule of lenity further counsels against expanding federal criminal law to police the breaches of contract and State regulatory violations alleged here. "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally v. United States*, 483 U.S. 350, 359–60 (1987). "There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." *Id.* at 360 (quoting *Fasulo v. United States*, 272 U.S. 620, 629 (1926)). *See also United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 96 (1820) (Marshall, C.J.) ("It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated."). Thus, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleveland*, 531 U.S. at 25 (quoting *Rewis*, 401 U.S. at 812).

It cannot be left to prosecutorial discretion to keep federal criminal law within its proper bounds. Criminal statutes may not be construed "on the assumption that the Government will 'use it responsibly.'" *McDonnell v. United States*, 579 U.S. 550, 576 (2016) (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)). Thus, this Court should reject an interpretation of federal criminal statutes that would "arm federal prosecutors with power to police false statements in an enormous range of submissions to state and local authorities." *Cleveland*, 531 U.S. at 26.

The Government prosecuted Dr. Bolos under several different theories of corporate misfeasance. None of those theories justifies his convictions.

***Prescription Brokering***. Central to the Government's theory of this prosecution is that HealthRight allegedly sold prescriptions to Synergy. *See, e.g.*, R.278, PageID#4051; R.707, PageID#8884–98. There was no proof of such an arrangement, however. The evidence was that Synergy paid a weekly flat fee to HealthRight for marketing based on legal advice. *See* Statement of Facts, *supra* at 7. The fee did not vary based on the number of patients or resulting prescriptions. *See id.*

Even if there were evidence of prescription brokering, it would not be actionable. No substantive federal healthcare offenses were indicted. The Government argued that the alleged prescription brokering was illegal under federal law (presumably the Anti-Kickback Statute or Stark Law, though the indictment cites neither). *See* R.278, PageID#4052. But the marketing agreement between HealthRight and Synergy falls within the federal safe harbor for "personal services and management contracts." *See* 42 C.F.R. § 1001.952(d). The Government also argued that the alleged prescription brokering was illegal under Florida law. *See* R.278, PageID#4048–50 (citing FLA. STAT. §§ 465.054(2) (prohibiting kickbacks for patients referred to a healthcare provider) & 465.185(1) (prohibiting kickbacks for patients referred to a pharmacy)). But those statutes are preempted by federal law. *Cf. State v. Harden*, 873 So. 2d 352 (Fla. Dist. Ct. App. 2004).

*Harden* held an analogous Florida anti-kickback statute governing Medicaid providers preempted by the federal Anti-Kickback Statute. *See id.* at 354–55. That is because the federal statute and regulations contain safe harbors not in the Florida statute and have a more rigorous scienter requirement. *See id.* On the authority of *Harden*, the Florida statutes cited in the indictment are federally preempted. Neither statute contains safe harbors or even a scienter requirement. *See generally*

FLA. STAT. §§ 465.054 & 465.185. These statutes thus cannot be the basis of a conviction.

*Inflated AWP*. According to the Government, Synergy purchased drugs at a significantly lower price than the manufacturer-reported average wholesale price ("AWP"). *See, e.g.*, R.278, PageID#4053–54. This caused the PBMs to reimburse Synergy for the drugs at higher prices and made the business more profitable. But the Government's witnesses conceded that Synergy had no control over the manufacturer-reported AWP (*see* R.783, PageID#13295), and the Government presented no evidence at trial that Synergy committed any wrongdoing with respect to drug pricing. Yet the "Inflated AWP" allegations were central to the Government's indictment. *See generally* R.278. Moreover, the jury was instructed that Synergy mailed "medications purchased substantially below the manufacturer reported average wholesale prices of those medications, knowing that the PBMs relied on manufacturer-reported . . . average wholesale prices in calculating how much to pay pharmacies." R.782, PageID#13234. But there was no proof of any wrongdoing with respect to drug pricing. Thus, the "Inflated AWP" allegations cannot support Dr. Bolos's convictions.

***Misleading Patients***. The Government claimed in the indictment and at trial that HealthRight tricked patients into buying medications they didn't want. *See* R.278, PageID#4057; R.707, PageID#8905. Roix admitted that Dr. Bolos was not involved in HealthRight's marketing efforts, however. R.624, PageID#9150, 9169. And the evidence showed that the patients had real pain; voluntarily sought help from real doctors; those doctors issued real prescriptions; and the patients received real medicines. *See* Statement of Facts, *supra* at 8–10. The call recordings between the patients and the doctors introduced at trial show that the patients authorized the prescriptions to be written. *See id.* The indictment portrays the PBMs, not the patients, as the victims of the alleged fraud. *See generally* R.278. Finally, there was no evidence that the medications mailed were ineffective or the mailings contained anything false. Dr. Bolos's convictions thus cannot be upheld based on allegations of misleading patients.

***The Doctor-Patient Relationship***. The Government charged Dr. Bolos with federal crimes based on allegations that Synergy filled prescriptions that were not based on a valid doctor-patient relationship. R.278, PageID#4061–64. But the pharmacies were not responsible for creating a valid doctor-patient relationship. The doctors were. The Government's theory improperly makes pharmacists the guarantors of full regulatory compliance by doctors.

The validity of the doctor-patient relationship turns on State law. The Government argued that HealthRight's doctors did not have sufficient engagement with the patients to write valid prescriptions. *See, e.g.*, R.779, PageID#12578–84; *see* TENN. BD. MED. EXAMINERS RULE 0880-02-.14(7)(a)(1) (requiring a physical examination for a doctor to write a prescription). But a Tennessee statute expressly allows doctors to write prescriptions based on telehealth visits. *See* TENN. STAT. ANN. § 56-7-1002. That statute further provides that a prescription may be validly issued based on "asynchronous computer-based communications." *Id.* §§ 56-7-1002(a)(6)(A), (d). The Tennessee telemedicine statute trumps the inconsistent administrative regulation requiring physical examination. *See Wright v. Tenn. Peace Officer Standards & Training Comm'n*, 277 S.W.3d 1, 15 (Tenn. App. 2008). More importantly, the inconsistency between the statute and the regulation underscores why Dr. Bolos cannot be charged with ensuring doctors' regulatory compliance.

The Supreme Court recently held that a doctor's subjective, good-faith belief that a controlled substance was validly prescribed is a complete defense to a prosecution for "knowingly" distributing a controlled substance "without authorization." *See Ruan v. United States*, 142 S. Ct. 2370 (2022). A pharmacist,

who is one step removed, cannot be held responsible for ensuring that doctors' telemedicine practices conformed with professional standards, which vary across the 50 states and are often inconsistent and ambiguous. Under *Ruan*, Dr. Bolos was entitled to rely on the prescribers' subjective, good-faith belief that the prescriptions were validly written.

In the wake of COVID-19, prescriptions written based on telemedicine have become increasingly common.[3] Many telehealth companies routinely offer patients the ability to get prescriptions for hair loss, contraception, erectile dysfunction, and other needs via a doctor they will never see in person.[4] The Government's theory improperly makes pharmacists the guarantors of State regulatory compliance concerning the doctor-patient relationship. The purported lack of a valid doctor-patient relationship cannot be the basis of a federal criminal conviction.

---

[3] *See generally* HHS, *New HHS Study Shows 63-Fold Increase in Medicare Telehealth Utilization During the Pandemic* (Dec. 3, 2021), https://www.hhs.gov/about/news/2021/12/03/new-hhs-study-shows-63-fold-increase-in-medicare-telehealth-utilization-during-pandemic.html.

[4] *See generally* Kate Gessner, *Telemedicine Startups Roman, Hims, and Keeps Show Enormous Growth* (Dec. 13, 2018), BLOOMBERG SECOND MEASURE, https://secondmeasure.com/datapoints/telemedicine-prescription-boxes-hims-roman-keeps/; Gabby Shacknai, *How Twentyeight Health Founder Amy Fan is Making Birth Control Accessible and Affordable*, FORBES (May 28, 2020), https://www.forbes.com/sites/gabbyshacknai/2020/05/28/how-twentyeight-health-founder-amy-fan-is-making-birth-control-accessible-and-affordable/?sh=3c9638db6704.

*Licensing Fraud*. The Government attempts to sustain Dr. Bolos's conviction on the invalidity of Synergy's Tennessee pharmacy license. It alleged the license was invalid because the pharmacist-in-charge falsely certified that he would supervise the pharmacy in person at least 20 hours a week. *See* R.710, PageID#9341. But the Supreme Court has squarely held that misrepresentations to a State agency in connection with a license application cannot be the basis of a mail-fraud conviction. *See Cleveland*, 531 U.S. at 15. Dr. Bolos's convictions cannot be sustained based on untruths in the pharmacy license application.

*Copay Collection and Precision's Ownership*. Critical to the Government's theory is that Synergy improperly failed to collect copays from patients and Dr. Bolos failed to disclose his ownership in Precision. *See, e.g.*, R.624, PageID#7630; R.714, PageID#10289. Copay collection and ownership disclosure are governed by the PBM contracts. *See, e.g.*, R.278, PageID#4047. As explained, a breach of contract is not fraud. *See O'Donnell*, 822 F.3d at 658; *D'Amato*, 39 F.3d at 1261 n.8; *Corley*, 388 F.3d at 1007; *Steffen*, 687 F.3d at 1116. Fraud requires a loss of "money or property," which did not happen here. *McNally*, 483 U.S. at 356. The copays were the patients' money and would have gone to Synergy, not the PBMs. R.624, PageID#7633–34, 7709–11; R.719, PageID#11080, 11090, 11113. The

plans set the copay amount and the Computer-RX system tells the pharmacy the amount. R.719, PageID#11113. The PBMs thus lost no money when Synergy failed to collect copays. The PBMs paid for real drugs for real patients with real pain based on real prescriptions from real doctors, less the copay set by the patients' plans. This Court has held that, where a party to a commercial transaction receives full consideration, there is no fraud. *See Sadler*, 750 F.3d at 590–92. The Government's allegations about copay collection and nondisclosure of Precision's ownership amount at most to breaches of contract, not federal felonies.

If the Court believes that any one of these theories is legally invalid, Dr. Bolos's convictions are automatically flawed. *See Skilling v. United States*, 561 U.S. 358, 414 (2010). Whether the convictions should be vacated is subject to harmless-error review. *See id.* The convictions must be vacated if the flawed theory "had substantial and injurious effect or influence in determining the jury's verdict." *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (quotation omitted). Dr. Bolos's convictions may only be upheld if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999) (cleaned up). It is the Government's burden to make this showing. *See United States v. Kurlemann*, 736 F.3d 439, 450 (6th Cir. 2013).

Instructing the jury that they could convict Dr. Bolos on these flawed theories was not harmless. The District Court instructed the jury on five different theories of conspiracy to commit healthcare fraud, none of which was legally sufficient to support a conviction. R.782, PageID#13266–13268. The cumulative effect of evidence about breaches of contract, State regulatory violations, and general corporate misfeasance could not have done anything other than encourage the jury to reach a guilty verdict. Instructing the jury on these flawed theories was thus not harmless. Dr. Bolos's convictions should be vacated.

### B.    The mail-fraud convictions must be vacated.

There was no fraud in this case because the PBMs got exactly what they paid for. The mail fraud statute only punishes schemes that cause the victim to lose "money or property." 18 U.S.C. § 1341; *see Kelly v. United States*, 140 S. Ct. 1565, 1572 (2020); *Cleveland*, 531 U.S. at 20; *McNally*, 483 U.S. at 360–61; *Carpenter v. United States*, 484 U.S. 19, 25 (1987).[5] Mere deceit, without a loss of property, cannot support a mail-fraud conviction. *See Kelly*, 140 S. Ct. at 1572 (explaining *Cleveland*'s holding that defendant's "conduct, however deceitful, was not property fraud").

---

[5] Because the mail and wire fraud statutes "share the same language in relevant part," the analysis is the same. *Carpenter*, 484 U.S. at 25 n.6.

Accordingly, this Court has held that the fraud must "deceiv[e]" the victims as to the "substantial identity of the thing which they are to receive in exchange." *Harrison v. United States*, 200 F. 662, 665 (6th Cir. 1912) (holding that a salesman cannot be convicted of mail fraud for exaggerating the qualities of a vacuum cleaner). In other words, there is no fraud when a misrepresentation is "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (quoting *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970)). *See also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (stating that, when the deceit is "collateral to the sale and [does] not concern the quality or nature of the goods being sold," there is no mail fraud). "Thus, even if a defendant lies, and even if the victim made a purchase because of that lie, a [mail]-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims 'received exactly what they paid for.'" *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) (quoting *Shellef*, 507 F.3d at 108) (Thapar, J.).

This Court's decision in *United States v. Sadler* is squarely on point and requires vacatur of Dr. Bolos's mail-fraud convictions. 750 F.3d 585 (6th Cir. 2014) (Sutton, J.). In *Sadler*, a "pill mill" owner was convicted of wire fraud for

buying drugs using a fake name and falsely telling pharmaceutical companies that the drugs were for indigent patients. *Id.* at 590. Despite the inaccurate information, the the defendant timely paid full price for all the drugs she purchased. *Id.* Thus, this Court held that the deceit did not deprive the pharmaceutical companies of property and vacated Sadler's wire-fraud conviction. *Id.* at 590–592. In accord is *United States v. Yates*, which cited *Sadler* and held that the defendant's lies about a bank's financial condition were not actionable under the bank fraud statute. 16 F.4th 256, 264–66 (9th Cir. 2021). There too, the lies did not seek to deprive the bank of money or property. *Id.*

Post-hoc testimony that the victim wouldn't have paid had she known the truth does not establish fraud. After all, there is a difference "between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *Shellef*, 507 F.3d at 108. Thus, this Court in *Sadler* held insufficient proof that the pharmaceutical companies would not have sold controlled substances to the defendant had they known about her "pill mill" operation. *Sadler*, 750 F.3d at 590–92. In accord is *United States v. Bruchhausen*, which held insufficient proof that manufacturers

would not have sold products to the defendant had they known the products would be re-sold to the Soviet Bloc. 977 F.2d 464, 467–69 (9th Cir. 1992) (vacating wire-fraud convictions). In further accord is *United States v. Novak*, which held insufficient the Government's "hypothetical contention" that the victims would not have paid for labor had they known the defendant was receiving kickbacks. 443 F.3d 150, 159 (2d Cir. 2006).

An indictment that merely alleges that the victim would have avoided the transaction, without alleging that the defendant misrepresented an essential element of the bargain, is insufficient as a matter of law. *See Shellef*, 507 F.3d at 109; *Bruchhausen*, 977 F.2d at 467–69.

Here, there was no fraud because the PBMs got exactly what they paid for. The essence of the bargain was that the PBMs would reimburse Synergy for drugs dispensed to patients. That is exactly what happened. Synergy submitted certain data in a standardized, electronic claims form: drug dispensing information, provider information, patient information, and copay information. *See* Statement of Facts, *supra* at 8–10. None of that information was false. *See id.* The PBMs instantly approved those claims via their computerized billing system. *See id.* The patients received the drugs just as Synergy said they did. *See id.*

46

Further, the PBMs are just middlemen between the insurance plans and the pharmacies. None of the conduct indicted here causes the PBMs, the alleged victims, to lose any money. The plans reimburse them for the drugs dispensed. R.624, PageID#7657. And if a pharmacy like Synergy has its contract cancelled by a PBM, a patient with a valid prescription can have it filled somewhere else. R.624, PageID#7654–55. Thus, none of the deceit here was intended to cause any PBM to lose "money or property."

There are no allegations or evidence that Dr. Bolos misrepresented the "quality, adequacy, or price" of the dispensed drugs. *Shellef*, 507 F.3d at 108 (quotation omitted). The indictment merely alleges that, had the PBMs known the truth about the alleged "prescription brokering," the doctor-patient problems, Precision's ownership, and Synergy's Tennessee pharmacy license, they would not have paid for the drugs. R.278, PageID#4052, 4064, 4066, 4069. Nowhere does the indictment say that Synergy misrepresented the essential elements of the bargain— *i.e.*, the price or nature of the drugs. *See Shellef*, 507 F.3d at 109; *Bruchhausen*, 977 F.2d at 467–69. The jury was not instructed on the definition of "money or property." Nor was it instructed that it must find that any misrepresentations went to the essence of the bargain. R.782, PageID#13247–49.

47

Moreover, at trial, there was no evidence that Dr. Bolos got "something for nothing" or that he "intended to get more for" the drugs than they were actually worth. *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970) (quoting *Harrison*, 200 F. at 666) (false representations to customers that induced them to purchase stationery were not actionable mail fraud because customers received all they bargained for). Thus, there was no deceit about the "substantial identity" of the transaction. *Harrison*, 200 F. at 665. The PBMs' post-hoc testimony that they would not have paid for the drugs had they known the truth does not establish fraud. *See Shellef*, 507 F.3d at 108; *Sadler*, 750 F.3d at 590–92; *Bruchhausen*, 977 F.2d at 467–69; *Novak*, 443 F.3d at 159. Nor does the PBMs' designation of copay collection and State regulatory compliance as conditions of payment automatically make such conditions essential to the bargain. *See Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 179, 191 (2016). The PBMs instantly approved the claims based on the truthful data the pharmacies submitted.

Express Scripts's witness testified that pharmacies sometimes collect copays after dispensing. R.624, PageID#7710–11. Express Scripts's provider manual merely says that, "in general," copays must be collected at the time of dispensing. GX-5A, AppPage#3-1564. The federal safe harbor allows pharmacies to waive

copays if, among other things, they make "reasonable collection efforts." 42 C.F.R. § 1001.952(k)(3). Further, the Tennessee Board of Pharmacy witness testified that no pharmacist license had ever been terminated for failing to meet the 20-hour-per-week requirement. R.711, PageID#9387. Any inaccurate information about copays or pharmacy licensure did not affect the value of the real medicines the PBMs paid for. The PBMs were thus not deprived of "money or property" under the mail-fraud statute.

At best, the PBMs may have been deprived of the right to accurate information about the level of doctor-patient engagement, pharmacy ownership and licensure, and copay collection. The Second Circuit has described this theory as fraud "through the withholding or inaccurate reporting of information that could impact on economic decisions." *United States v. Ciminelli*, 13 F.4th 158, 170 (2d Cir. 2021), *cert. granted*, 142 S. Ct. 2901 (2022) (quotation omitted). This Court rejected the "right to accurate information" theory in *Sadler*, however. *Sadler* held that the Government may not stretch the mail fraud statute "to cover the right to accurate information before making an otherwise fair exchange." *Sadler*, 750 F.3d at 591. The Supreme Court granted certiorari in *Ciminelli* to resolve the circuit split on the "right to accurate information" theory of mail fraud. 142 S. Ct. 2901. In the meantime, *Sadler* remains the law of the circuit. Because the PBMs may only

49

be said to have been deprived of the right to accurate information, not money or property, *Sadler* requires vacatur of Dr. Bolos's mail-fraud convictions.

The PBM contracts cannot support Dr. Bolos's mail-fraud convictions. At trial, the Government argued that failure to provide accurate information about the level of doctor-patient engagement, Synergy's Tennessee pharmacy license, and the pharmacies' copay collection efforts violated the PBM contracts and thus constituted fraud. R.782, PageID#13040, 13045, 13047, 13050–51, 13071. Dr. Bolos's mail-fraud convictions cannot stand on this theory. First, none of that information goes to the essence of the bargain. The PBMs' billing system didn't even ask for it. Below is an excerpt from GX-12W, AppPage#4-1892, which shows the information Express Scripts used to adjudicate and pay each claim:

| PHCY_ID | PHCY_NME | PHCY_RX_NBR | MAIL_SERVICE_RX_NBR | MAIL_SERVICE_RX_SRC_CDE | SERVICED_DTE |
|---|---|---|---|---|---|
| PHARMACY_ID | PHARMACY_NAME | RX# | MAIL_RX# | MAIL_RX#_SOURCE | FILL_DATE |

| FILL_DAYS_SUPPLY_QTY | PAY_PATIENT_PAY_AMT | SBMTD_FINAL_INGRED_COST_AMT | PAY_NET_CHECK_AMT | PRODUCT_SERVICE_ID | LABEL_TXT |
|---|---|---|---|---|---|
| DAYS_SUPPLY | COPAY_AMT | PROVIDER_SUBMITTED_AMT | PROVIDER_PAID_AMT | NDC | DRUG_LABEL_NAME |

| DEA_CDE | CARRIER_NAME | CARRIER_OPERATIONAL_ID | CLIENT_MEMBERSHIP_ID | BIRTH_DTE | MBR_FIRST_NME |
|---|---|---|---|---|---|
| DEA_SCH_ID | CLIENT_NAME | CLIENT_ID | MEMBER_ID | MEMBER_DOB | MEMEBER_FIRST_NAME |

| MBR_LAST_NME | MBR_ADDR_LINE_1_TXT | MBR_CITY_NME | MBR_STATE_OR_PROVINCE_CDE | MBR_ZIP_5_POSTAL_CDE | PRSCRBR_NPI_NBR |
|---|---|---|---|---|---|
| MEMBER_LAST_NAME | MEMBER_ADDRESS | MEMBER_CITY | MEMBER_STATE | MEMBER_ZIP | PRESCRIBER_NPI |

| PRSCRBR_FIRST_NME | PRSCRBR_LAST_NME | PRSCRBR_STREET_ADDR_LINE_1_TXT | PRSCRBR_STREET_ADDR_LINE_2_TXT |
|---|---|---|---|
| PRESCRIBER_FIRST_NAME | PRESCRIBER_LAST_NM | PRESCRIBER_ADDR1 | PRESCRIBER_ADDR2 |

| PRSCRBR_STREET_ADDR_LINE_3_TXT | PRSCRBR_CITY_NME | PRSCRBR_STATE_OR_PROVINCE_CDE | PRSCRBR_POSTAL_CDE |
|---|---|---|---|
| PRESCRIBER_ADDR3 | PRESCRIBER_CITY | PRESCRIBER_STATE | PRESCRIBER_ZIP |

50

*See also* R.624, PageID#7575 (testimony from Express Scripts witness explaining that these are "a representation of the fields submitted by a pharmacy or the claim records that were billed by a pharmacy"). CVS's claims fields are similar. *See, e.g.*, GX-11F, AppPage#4-1890. Synergy input truthful data in the Computer-RX billing protocol. *See* Statement of Facts, *supra* at 8. The PBMs instantly approved the claims. *See id.* The PBMs only audited the claims after the fact. R.624, PageID#7567, 7587–88. The Government cannot claim that collateral information about the doctor-patient relationship, pharmacy ownership and licensure, and copay collection was essential to the bargain.

Second, this theory of "fraud" amounts to no more than a breach of contract. Again, there is no false information in Synergy's claims. The only affirmative misrepresentations that may be said to exist here are promises in the provider manuals that the pharmacies would collect copays, fill only prescriptions with a valid doctor-patient relationship, and comply with State regulatory laws. But mere breaches of contractual promises are not fraud. *See O'Donnell*, 822 F.3d at 660; *D'Amato*, 39 F.3d at 1261 n.8; *Corley*, 388 F.3d at 1007; *Steffen*, 687 F.3d at 1116. The Government cannot transform a breach of the PBM contracts into mail fraud. Dr. Bolos's mail-fraud convictions must be vacated.

At minimum, the five mail-fraud counts concerning patients who did not testify, and whose prescribing physician did not testify, must be vacated. These patients were Jessica Rush (Count 7), Theresa Sharp (Count 8), Johnna Ferrell (Count 19), Chad Allen (Count 22), and Tanya Amburn (Count 23). For these patients, there was no testimony about the level of interaction between doctor and patient. Thus, the lack of a valid doctor-patient relationship cannot be the basis of a mail-fraud conviction. The convictions on these five counts must be vacated for lack of evidence.

### C.    The conviction for conspiracy to commit healthcare fraud must be vacated.

Dr. Bolos's conviction for conspiracy to commit healthcare fraud must be vacated for two reasons. First, there was insufficient proof of materiality. "The term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Escobar*, 579 U.S. at 192–93 (cleaned up). The crime of healthcare fraud requires that the false statement be material. Doc. 782, PageID #13266–68 (trial court's instruction on conspiracy to commit healthcare fraud); *cf. Neder*, 527 U.S. at 25 (holding that the federal mail fraud, bank fraud, and wire fraud statutes require proof of a material falsehood). Where an indictment is insufficient to charge the underlying offense, a conspiracy count based on that offense must also fail. *See United States v. Bobo*,

344 F.3d 1076, 1086 (11th Cir. 2003). As explained, the PBMs received full consideration for the bargain when the patients received the drugs as billed. And all of the claims data Synergy submitted to the PBMs, which is the only information material to payment, was truthful. Thus, none of the deceit about prescription brokering, the doctor-patient relationship, Precision's ownership, copay collection, or Synergy's pharmacy license was material. R.782, PageID#13266–68 (explaining the theories on which the jury could have convicted Dr. Bolos for healthcare fraud).

Second, Dr. Bolos did not have the intent necessary to conspire to commit healthcare fraud. When the Government charges a conspiracy to commit a regulatory offense that is *malum prohibitum*, it must prove a "corrupt intent," or "the conscious and intentional purpose to break the law." *Landen v. United States*, 299 F. 75, 78 (6th Cir. 1924). This is known as the *Powell* doctrine. *See People v. Powell*, 63 N.Y. 88 (1875) (Andrews, J.); *United States v. Trevino*, 7 F.4th 414, 425 (6th Cir. 2021). Thus, there can be no conspiracy when (1) "the contemplated act is not inherently wrongful," (2) "the prohibitory statute is ambiguous," (3) "there is good reason for both lawyers and laymen to think that the act planned is not prohibited," and (4) the defendant "plans and does the act in the actual belief, supported by good-faith advice of counsel, that it is a lawful act." *Landen*, 299 F.

at 79; *Trevino*, 7 F.4th at 426. *Contra United States v. Cohen*, 260 F.3d 68, 73 (2d Cir. 2001) (rejecting application of the *Powell* doctrine to conspiracy to violate 18 U.S.C. § 1084).

*Landen* requires vacatur of Dr. Bolos's conspiracy conviction. First, the underlying offense of healthcare fraud is a *malum prohibitum*, regulatory crime first adopted in 1996. *See* 18 U.S.C. § 1347; Pub. L. 104-191, Title II, § 242(a)(1) (Aug. 21, 1996). Second, the legality of the conduct here is ambiguous. The fraud alleged here consists of conduct governed by lengthy PBM manuals and State healthcare statutes and regulations. In the case of the Tennessee regulatory regime, the telemedicine statute is inconsistent with the regulation governing the doctor-patient relationship. *Compare* TENN. BD. MED. EXAMINERS RULE 0880-02-.14(7)(a)(1) (requiring a physical examination for a doctor to write a prescription) *with* TENN. STAT. ANN. § 56-7-1002(a)(6)(A) (permitting "asynchronous computer-based communications").

Third, there is good reason for both lawyers and laymen to think that the federal healthcare fraud statute does not punish breaches of contract or State regulatory violations. As explained, mere breaches of contract cannot support a fraud conviction. The Tennessee telemedicine statute expressly allows

prescriptions based on asynchronous interaction between doctor and patient via computer. And the Florida anti-kickback statutes are preempted. These State laws give no reason to think that noncompliance constitutes federal healthcare fraud. Moreover, Assad testified that he believed the HealthRight arrangement was legal. R.716, PageID#10546–47, 10454–55. Fourth, Dr. Bolos sought and received legal counsel on Synergy's business practices, including the HealthRight arrangement. *See, e.g.*, R.775, PageID#11724–25; R.775, PageID#11781–82, 11814–15; R.776, PageID#11989, 12054, 12060; DX-45, AppPage#61-134082; 52, AppPage#61-134105; 54, AppPage#61-134120. He testified that he believed the arrangement was lawful and consistent with his counsel's advice. *See id.*; *see also* R.775, PageID#11846. Under *Landen*, Dr. Bolos did not have the corrupt intent necessary to support a conviction for conspiracy to commit healthcare fraud. His conviction must therefore be vacated.

### D.    The misbranding conviction must be vacated.

Dr. Bolos was convicted under the Food, Drug, and Cosmetic Act ("FDCA") for "[t]he introduction or delivery for introduction into interstate commerce of any . . . drug . . . that is adulterated or misbranded." 21 U.S.C. § 331(a). The indictment charges that, on February 26, 2016, Dr. Bolos dispensed a misbranded Lidocaine prescription to patient W.S. without a valid doctor-patient relationship. R.278,

55

PageID#4079. The indictment does not charge misbranding with respect to any other patients. Dr. Bolos's conviction must be vacated because the misbranding statute is unconstitutionally vague and Dr. Bolos had no knowledge or control over the doctor-patient relationship on the specified date.

### 1. The misbranding statute is unconstitutionally vague.

Under the Fifth Amendment, the Government may not "tak[e] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (invalidating 18 U.S.C. § 924(e)(2)(B)'s residual clause, which increases punishment for undefined "conduct that presents a serious potential risk of physical injury to another"). Thus, a statute "is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A criminal prohibition with no scienter requirement necessarily entails closer scrutiny. *Cf. Vill. of Hoffman Ests. v. Flipside*, *Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (noting that vagueness concerns can be alleviated if the statute features a scienter requirement).

The misbranding statute is unconstitutionally vague. Sections 331 and 333 of the FDCA impose criminal liability (with no scienter requirement) for the

introduction of misbranded drugs into interstate commerce. 21 U.S.C. §§ 331, 333. The Government sought to prove that, on February 26, 2016, Dr. Bolos dispensed Lidocaine that was misbranded under 21 U.S.C. § 353. R.278, PageID#4079. Section 353 provides that certain drugs must "be dispensed only upon a written prescription of a practitioner licensed by law to administer such drug." *Id.* § 353(b)(1). It further provides that otherwise dispensing a drug wrongfully "shall be *deemed* to be an act which results in the drug being misbranded while held for sale." *Id.* (emphasis added).

This provision cannot support a misbranding conviction. First, the drugs were in fact dispensed "upon a written prescription of a practitioner licensed by law to administer such drug." *Id.*; R.783, PageID#13334–38. The Government argued that the Lidocaine prescription nonetheless ran afoul of the statute because it was not based on a "doctor-patient relationship." R.783, PageID#13335. This theory, which relies on a "deemer" provision as vague as the residual clause in *Johnson*, stretches the statute far beyond its constitutional bounds. Notably, the Government admitted that the text of "the statute doesn't specify that a prescription can be misbranded if it's issued in the absence of a valid doctor-patient relationship." R.783, PageID#13337. Nonetheless, it attempted (without expert testimony) to rely on State statutes, regulations, and private contracts and guidance

documents to define a valid doctor-patient relationship. *See* R.783, PageID#13339–40. But such extratextual embellishment goes far beyond the plain meaning of the statute. This is a textbook example of a law that fails to "give people 'of common intelligence' fair notice of what the law demands of them." *Davis*, 139 S. Ct. at 2325 (quotation omitted). As applied to Dr. Bolos, the misbranding statute is unconstitutionally vague.

### 2.    The Government did not prove misbranding.

Even if the misbranding statute is not unconstitutionally vague, Dr. Bolos's conviction should still be vacated because the evidence was insufficient to prove misbranding. The misbranding statute prohibits, with no scienter requirement, the "introduction or delivery for introduction into interstate commerce of any . . . drug . . . that is adulterated or misbranded." 21 U.S.C. § 331(a). But Section 333 upgrades misbranding from a misdemeanor into a felony if the Government shows that the defendant acted "with the intent to defraud or mislead." *Id.* § 333(a)(2).

"The felony provision requires knowledge of the misbranding and proof of specific intent to mislead or defraud connected to the misbranding violation." *United States v. Mitcheltree*, 940 F.2d 1329, 1351 (10th Cir. 1991). "[K]nowledge

of the essential nature of the alleged fraud is a component of the intent to defraud." *United States v. Hiland*, 909 F.2d 1114, 1128 (8th Cir. 1990); *cf. United States v. Chin*, 15 F.4th 536, 546 (1st Cir. 2021) (finding intent to defraud where pharmacist knew that the patient names were faked). Further, the Government's evidence about Dr. Bolos's "intent to defraud or mislead must relate to [the alleged misbranding], and not to some other possible wrongdoing." *See United States v. Geborde*, 278 F.3d 926, 928 (9th Cir. 2002).

Moreover, the Supreme Court has long required the Government to prove that a defendant has "a responsible share in the furtherance of the transaction which the statute outlaws." *United States v. Dotterweich*, 320 U.S. 277, 284 (1943). That "responsibility" turns on the defendant's "knowledge, and if knowledge is established it depends further on the action or nonaction of" Dr. Bolos "after he has obtained knowledge." *United States v. Abbott Lab'ys*, 505 F.2d 565, 574 (4th Cir. 1974). Thus, Dr. Bolos may defend a misbranding charge on the ground that he "was 'powerless' to prevent or correct the violation." *United States v. Park*, 421 U.S. 658, 673 (1975). The Government has the "ultimate burden of proving beyond a reasonable doubt the defendant's guilt, including his power, in light of the duty imposed by the Act, to prevent or correct the prohibited condition." *Id.*

The misbranding conviction must be vacated because the Government introduced no evidence that Dr. Bolos (1) knew about the alleged February 26, 2016, misbranding or (2) was empowered to correct it. First, the Government introduced no evidence establishing that Dr. Bolos had any knowledge of patient complaints of insufficient interaction with doctors before February 26, 2016. The testimony established that Dr. Bolos was unaware of the problem until April 13, 2016, when an employee first notified him that patients were complaining that they had not spoken with their physicians. *E.g.*, R.713, PageID#9957–58. Dr. Bolos also testified that was when Assad approached him about doctors not talking to patients. R.775, PageID#11839–40. Assad also testified that April 13, 2016, is the first time he raised the issue with Dr. Bolos. R.713, PageID#9925–35. The Government itself noted that the District Court may be "concerned that there's no evidence to support" that Dr. Bolos "knew beforehand" about the lack of doctor-patient relationships. R.783, PageID#13362.

Second, there was no evidence that Dr. Bolos was empowered to correct the February 26, 2016, misbranding. Dr. Bolos testified that he had no access to or control over the HealthRight portal that facilitated communication between the doctor and the patient. *See, e.g.*, R.783, PageID#13368. This evidence shows two

things. First, it shows that the operation was set up to allow doctor-patient relationships—hardly an indication that Dr. Bolos had failed to set up appropriate safeguards. Second, it shows that Dr. Bolos was powerless to effectuate meetings between doctors and patients.

Moreover, the Government did not prove that Dr. Bolos failed to act upon learning of the misbranding. Dr. Bolos immediately sought more information from Scott Roix upon learning in April 2016 of the lack of doctor-patient contact. *See* R.776, PageID#11969–70. Thus, there was insufficient evidence to prove that Dr. Bolos (1) had the requisite knowledge on February 26, 2016, and (2) failed to act once he learned of the absence of doctor-patient relationships. *See Abbott Lab'ys*, 505 F.2d at 573. Dr. Bolos's misbranding conviction must therefore be vacated. At minimum, the conviction should be downgraded to a misdemeanor because of the lack of evidence that Dr. Bolos intended to defraud the PBMs on February 26, 2016, the date alleged.

## II.    The District Court miscalculated Dr. Bolos's sentence.

As an initial matter, should any of Dr. Bolos's convictions be vacated on the merits, this case must be remanded for resentencing. Even if the convictions are not vacated, however, Dr. Bolos's sentence was improperly calculated.

61

The District Court erred by aggregating all pharmaceutical claims to determine the loss amount without proof that they were all invalid. R.885, PageID#14699. The Guidelines provide for a sliding scale of sentencing enhancements depending on the amount of loss the Government proves. U.S.S.G. § 2B1.1(b)(1). The parties agreed to use the "actual loss" to the PBMs in performing the calculation instead of the "intended loss." *See* R.885, PageID#14697. If the loss "reasonably cannot be determined," the District Court "shall use the gain that resulted from the offense as an alternative measure of loss." *See id.* at cmt. n.3(B).

Gross billings are not an appropriate measure of loss. *See United States v. Mehmood*, 742 F. App'x 928, 941 (6th Cir. 2018) (citing *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007)). Testimony that a healthcare payor would not have paid for any of the claims had it known of the defendant's fraud scheme does not justify using gross billings as the loss amount. *Id.* at 940–41. "[T]he value of any *legitimate* claims, if established, must be offset against the aggregate billings." *Id.* at 941 (emphasis in original).

The District Court erred by using gross billings without proof that all claims were fraudulent. There was no proof that any State laws or regulations governing the doctor-patient relationship were violated, except (arguably) Tennessee's and Florida's. *See, e.g.*, R.779, PageID#12578–84. With no such proof, the prescriptions filled in other States must be presumed legal.

The District Court applied an exception to this presumption that applies when the fraud is "pervasive." *See* R.885, PageID#14699; *United States v. Bryant*, 849 F. App'x 565, 572 (6th Cir. 2021) (defendants convicted of defrauding Medicaid); *United States v. Lovett*, 764 F. App'x 450, 460 (6th Cir. 2019) (defendants convicted of defrauding Medicare); *United States v. Mahmud*, 541 F. App'x 630, 636 (6th Cir. 2013) (same); *Triana*, 468 F.3d at 320 (same).

The District Court was wrong to do so for two reasons. First, the "pervasive" fraud exception originates with U.S.S.G. § 2B1.1 cmt. n.3(F)(viii), which allows use of gross billings when the defendant is convicted of a *federal* healthcare offense involving a *federal* payor. *See Lovett*, 764 F. App'x at 460; *Bryant*, 849 F. App'x at 571; *Mahmud*, 541 F. App'x at 636; *Triana*, 468 F.3d at 320. The Government conceded that the scheme was designed to exclude federal healthcare programs and thus did not cause any loss to a federal payor. R.956, PageID#16089.

Because only private PBMs were the victims here, the "pervasive" fraud exception does not come into play. Moreover, § 2B1.1 cmt. n.3(F)(viii) deals with "intended loss," not "actual loss." The parties agreed to use "actual loss" here. Second, the exception improperly shifts the burden of proving the enhancement's nonapplication to the defendant. *Cf. United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013) (holding that "the prosecution"—not the defendant—"has the burden to prove by a preponderance of the evidence that the enhancement applies"). The Government did not carry its burden to establish a reasonable estimate of the loss amount because it failed to show any fraudulent claims outside of Tennessee.

Section 2B1.1 thus required the District Court calculate Dr. Bolos's gain rather than the PBM's loss. The parties agreed that Dr. Bolos's gain was only $2.5 million. R.774, PageID#11606; R.825, DocID#14060–61; R.956, DocID#16093. The enhancement in Section 2B1.1 should have thus been 16, not 24 as calculated by the District Court. This sentencing error is not harmless. *See, e.g.*, *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010) ("An error with respect to the loss calculation is a procedural infirmity that typically requires remand."). Dr. Bolos's sentence must therefore be vacated and this case remanded for resentencing.

## CONCLUSION

For these reasons, this Court should reverse the judgment and render a judgment of acquittal on all counts. Alternatively, this Court should reverse the judgment and remand this case for a new trial. At minimum, Dr. Bolos's sentence must be vacated and this case remanded for resentencing.

Respectfully submitted,

*/s/ Scott Burnett Smith*

Scott Burnett Smith
Hunter W. Pearce
Bradley Arant Boult Cummings LLP
200 Clinton Avenue West, Suite 900
Huntsville, AL 35801
Tel: (256) 517-5100
Fax: (256) 517-5200
ssmith@bradley.com
hpearce@bradley.com

R. Sumner Fortenberry
Bradley Arant Boult Cummings LLP
One Jackson Place
188 East Capitol Street, Suite 1000
Jackson, Mississippi 39201
(601) 948-8000
(601) 948-3000
sfortenberry@bradley.com

*Counsel for Defendant-Appellant Dr. Peter Bolos*

December 9, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(a)(7) and 6th Circuit Rule 32(a), I certify that this brief complies with the applicable type-volume limitation. According to the word count in Microsoft Word, there are 12,746 words in this brief, excluding the items omitted from the computation by Rule 32(f).

*/s/ Scott Burnett Smith*
*Counsel for Defendant-Appellant Dr. Peter Bolos*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th of December 2022, I filed the foregoing document via the ECF filing system which will send notification and a complete copy to the following counsel of record:

Mac D. Heavener, III
United States Attorney's Office,
Eastern District of Tennessee
220 West Depot Street, Suite 423
Greenville, TN 37743
Phone: 423-639-6759
mac.heavener@usdoj.gov

*/s/ Scott Burnett Smith*
*Counsel for Defendant Dr. Peter Bolos*

**DESIGNATION OF RELEVANT DOCUMENTS IN THE ELECTRONIC RECORD**

| **Document Number** | **Description** | | **Page ID#** |
|---|---|---|---|
| 278 | First Superseding Indictment | | 4047 |
| 126 | Motion to Dismiss Indictment by different Defendant | | 1260 |
| 127 | Motion to Dismiss Indictment (adopting 126) | | 1299 |
| 175 | Order denying Motion to Dismiss | | 1657 |
| 707 | Transcript | 11/3 | 8882 |
| 708 | Transcript | 11/4 | 8918 |
| 709 | Transcript | 11/5 | 9183 |
| 630 | Transcript (Pam Guertin) | 11/5 | 7745 |
| 631 | Transcript (Pam Guertin) | 11/8 | 7936 |
| 710 | Transcript | 11/8 | 9247 |
| 711 | Transcript | 11/9 | 9368 |
| 712 | Transcript | 11/10 | 9648 |
| 713 | Transcript | 11/11 | 9914 |
| 714 | Transcript | 11/12 | 10149 |
| 624 | Transcript (Blake Stockwell) | 11/12 | 7563 |
| 625 | Transcript (Blake Stockwell) | 11/13 | 7716 |
| 716 | Transcript | 11/15 | 10367 |
| 717 | Transcript | 11/16 | 10672 |
| 718 | Transcript | 11/17 | 10815 |
| 719 | Transcript | 11/18 | 11030 |
| 641 | Transcript (Rani Shehata) | 11/18 | 8132 |
| 783 | Transcript | 11/19 | 13281 |
| 628 | Motion for Acquittal | 11/19 | 7742 |
| 779 | Transcript | 11/22 | 12328 |
| 780 | Transcript | 11/23 | 12614 |
| 775 | Transcript | 11/29 | 11609 |
| 776 | Transcript | 11/30 | 11937 |
| 781 | Transcript | 11/30 | 12877 |
| 655 | Order Denying Acquittal | 11/30 | 8304 |
| 782 | Transcript | 12/1 | 13008 |
| 663 | Jury Verdict | 12/2 | 8316 |
| 668 | Motion for New Trial | 12/13 | 8349 |
| 669 | Renewed Motion for Acquittal | 12/13 | 8354 |
| 702 | Motion for New Trial | 2/14 | 8553 |
| 768 | Order Denying Motions for New Trial/Acquittal | 4/22 | 11551 |

| 774 | Agreed Preliminary Order of Forfeiture | | 4/25 | 11605 |
| 825 | Defendant's Sentencing Memorandum | | 5/4 | 14030 |
| 885 | Sentencing Order | 5/31 | | 14695 |
| 888 | Notice of Appeal | 6/6 | | 14717 |
| 894 | Judgment | 6/14 | | 14746 |
| 910 | Notice of Appeal re: Judgment | 6/14 | | 14816 |
| 918 | Noticed of Amended Appeal | 7/8 | | 14874 |
| 956 | Transcript of Sentencing | 5/16 | | 16064 |